**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gilberto Garcia Moralez,<br><br>   Petitioner,<br><br>vs.<br><br>Louis Winn,<br><br>   Respondent. | No. CIV 13-430-TUC-LAB<br><br>**ORDER** |

On June 5, 2013, Gilberto Garcia Moralez, an inmate confined in the Federal Correctional Institution in Tucson, AZ, filed a Petition for Writ of Habeas Corpus pursuant to Title 28, United States Code, Section 2241. (Doc. 1) Moralez claims his Constitutional rights were violated by the Discipline Hearing Officer (DHO) who found he had engaged in disruptive conduct similar to stealing and sanctioned him with a loss of good time sentencing credit. *Id*.

The respondent, Louis Winn, filed a combined answer and motion to dismiss opposing the petition on October 21, 2013. (Doc. 12)

Magistrate Judge Bowman presides over this action pursuant to 28 U.S.C. § 636(c). (Doc. 14)

The petition will be denied. The decision of the DHO is supported by some evidence. Moralez's due process rights were not violated.

//

//

1     <u>Summary of the Case</u>

2     At the time of the incident, Moralez was incarcerated at the United States Penitentiary Coleman II in Sumterville, Florida. (Doc. 12-1, ¶ 7) On July 16, 2011, staff at the penitentiary intercepted a letter and several documents that Moralez was trying to mail to the Internal Revenue Service (IRS). *Id.* One of the documents was a tax return reflecting $10,085.40 in "other income." *Id.* Also included were notices of intent to levy in the amounts of $10,085.40 and $300.64, which the IRS previously had sent to him. *Id.* On the notices, Moralez wrote a sort of endorsement labeled "accept for value" and "charge back" and referencing the UCC 3-419 and the House Joint Resolution 192 of June 5, 1933. (Doc. 12-3, p. 7) In his letter, Moralez instructs the IRS to file the tax return "for a return to the source" and "zero the account." (Doc. 12-3, p. 4)

    Coleman staff wrote an Incident Report charging Moralez with attempted stealing. (Doc. 12-1, ¶ 8) The report was delivered to Moralez on July 16, 2011. *Id.* Moralez was advised of his rights under the disciplinary process by a lieutenant after which he made a statement. *Id*. The lieutenant directed that Moralez proceed to a United Discipline Committee (UDC) hearing. *Id*.

    On July 19, 2011, the UDC referred the matter to the Discipline Hearing Officer (DHO) and provided Moralez with a notice of hearing and an advisement of his rights. (Doc. 12-1, ¶ 9) Moralez acknowledged receipt of the notice and advisement and requested a staff member to serve as his representative at the hearing. *Id.*

    The DHO hearing took place on August 2, 2011. (Doc. 12-1, ¶ 10) Moralez was represented by a staff member and offered the testimony of a lieutenant who vouched for his good character. *Id*.

    Moralez denied the charges against him and argued he had not been interviewed by a lieutenant when he was given the incident report. (Doc. 12-1, ¶ 11) He admitted, "I am aware of owing the government money (10,000) and using a 'direct treasury account' which is actually credit." *Id.* He further admitted that the signature on the "money order" was his. *Id.*

The DHO concluded that Moralez had attempted to satisfy his IRS debt by presenting a fraudulent "money order" designed to look like a "real bank draft." (Doc. 12-1, ¶ 11) He found Moralez committed a Code 299 prohibited act, disruptive conduct, most like Code 219, stealing. (Doc. 12-1, ¶ 12) He imposed 30 days of disciplinary segregation and disallowed 27 days of good conduct time and 60 days of non-vested good time. (Doc. 12-1, ¶ 13)

Moralez appealed the decision of the DHO through all administrative levels. (Doc. 12-1, ¶¶ 14-15)

On June 5, 2013, Moralez filed the pending Petition for Writ of Habeas Corpus pursuant to Title 28, United States Code, Section 2241. (Doc. 1) He argues he did not engage in fraudulent conduct and his due process rights were violated. *Id.* The respondent filed a combined answer and motion to dismiss on October 21, 2013. He argues Moralez's claims should be denied on the merits. (Doc. 12) Moralez filed a reply on November 4, 2013. (Doc. 16)

Discussion

Federal prisoners have a statutory right to good time credits. *See* 18 U.S.C. § 3624. Accordingly, they have a due process interest in the disciplinary proceedings that may take away those credits. *Wolff v. McDonnell*, 418 U.S. 539, 556-57 (1974). "Due process in a prison disciplinary hearing is satisfied if the inmate receives written notice of the charges, and a statement of the evidence relied on by the prison officials and the reasons for disciplinary action." *Zimmerlee v. Keeney*, 831 F.2d 183, 186 (9th Cir. 1987), *cert. denied*, 487 U.S. 1207 (1988). "The inmate has a limited right to call witnesses and to present documentary evidence when permitting him to do so would not unduly threaten institutional safety and goals." *Id.*

The final decision to revoke good time credits must be based on "some evidence." *Superintendent v. Hill*, 472 U.S. 445, 455 (1985). "The relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56. If so, then due process is satisfied. *Id.* The court need not examine the entire record, independently assess the credibility of the witnesses, or weigh the evidence. *Id.* at 455.

1  In Claim (1), Moralez argues he did not commit the offense, Code 299, disruptive
2 conduct, because "the facts show that on July 16, 2011 the institution's security was never
3 disrupted in any way by me." (Doc. 1, p. 4)  This offense, however, covers more conduct than
4 Moralez is willing to acknowledge.

5  The DHO found Moralez committed a Code 299 prohibited act, disruptive conduct, most
6 like Code 219, stealing.  (Doc. 12-1, ¶ 12)  The offense, Code 299, covers "[c]onduct which
7 disrupts or interferes with the security or orderly running of the institution or the Bureau of
8 Prisons most like another High severity prohibited act."  28 CFR § 541.3, Table 1.  Here,
9 Moralez was trying to defraud the IRS and using the prison mail system to deliver the fraudulent
10 documents.  Fraudulent conduct obviously interferes with the orderly running of any
11 correctional institution.  Accordingly, Moralez's conduct was sufficient to constitute a Code 299
12 violation.

13  Moralez also complains that the original incident report was delivered to him by an
14 officer Clark and not by Lieutenant Haynes.  He maintains Clark asked him if he had any
15 comments but did not record his statements.  Moralez does not explain, however, how these
16 irregularities affected the outcome of the hearing.  He does not claim he lacked written notice
17 of the violation.  Neither does he claim he lost an opportunity to present evidence.  The alleged
18 irregularities did not violate his due process rights.  *See Armstrong v. Warden of USP Atwater*,
19 2011 WL 2553266, 8 (E.D.Cal. 2011) ("[A] violation of a BOP regulation, without more, does
20 not rise to the level of a due process violation.").

21  In Claims (2) and (3) Moralez argues he did not engage in fraudulent conduct.
22 Specifically, in Claim (2), Moralez argues he did not commit fraud because he really has a "pre-
23 paid account."  (Doc. 1, p. 5)  In Claim (3), Moralez explains that the IRS is not a government
24 agency but a collection agency for the country's creditors.  (Doc. 1, p. 6)  He argues the House
25 Joint Resolution 192 taking the country off the gold standard created the "insolvency" in the
26 first place forcing him to use this "pre-paid account."   *Id.*

27
28

The court finds the DHO had "some evidence" to support his finding that Moralez engaged in fraudulent conduct. Accordingly, there was no due process violation. In fact, Moralez's "pre-paid account" theory is entirely frivolous.

Moralez's fanciful monetary theory is well known to the courts. It has been characterized as "equal parts revisionist legal history and conspiracy theory." *Bryant v. Washington Mut. Bank*, 524 F.Supp.2d 753, 758 (W.D.Va. 2007)  It goes like this:

> Supposedly, prior to the passage of the Fourteenth Amendment, there were no U.S. citizens; instead, people were citizens only of their individual states. Even after the passage of the Fourteenth Amendment, U.S. citizenship remains optional. The federal government, however, has tricked the populace into becoming U.S. citizens by entering into 'contracts' embodied in such documents as birth certificates and social security cards. With these contracts, an individual unwittingly creates a fictitious entity (i.e., the U.S. citizen) that represents, but is separate from, the real person. Through these contracts, individuals also unknowingly pledge themselves and their property, through their newly created fictitious entities, as security for the national debt in exchange for the benefits of citizenship. However, the government cannot hold the profits it makes from this use of its citizens and their property in the general fund of the United States because doing so would constitute fraud, given that the profits technically belong to the actual owners of the property being pledged (i.e., the real people represented by the fictitious entities). Therefore, the government holds the profits in secret, individual trust accounts, one for each citizen.
> Because the populace is unaware that their birth certificates and such are actually contracts with the government, these contracts are fraudulent. As a result, the officers of government are liable for treason unless they provide a remedy that allows an individual to recover what [he] is owed—namely, the profits held in [his] trust account, which the government has made from its use of [him] and [his] property in the commercial markets. In 1933, the government provided just such a remedy with House Joint Resolution 192, and the Uniform Commercial Code (UCC) provides the means for a person to implement it. The fact that virtually no one is aware of this remedy or how to use it is all part of the government's scheme—if no one takes advantage of the remedy, the government can keep the money, so it is in the government's interest that the remedy be obscure. However, one such as [petitioner], who learns of and is able to implement the remedy, can supposedly use the debt owed to [him] by the government to discharge [his] debts to third parties with Bills of Exchange that are drawn on [his] trust account.

*Bryant v. Washington Mut. Bank*, 524 F.Supp.2d 753, 758-759 (W.D.Va. 2007). Moralez's argument that he did not engage in fraudulent conduct is entirely frivolous.

In Claim (4), Moralez complains that the DHO report states that the money orders appear to be from "our" fraudulent account. (Doc. 1, p. 7)  He asserts he knows nothing about this alleged BOP account.

The DHO report states, in pertinent part, that "these money orders appear to be from *our* fraudulent account." (Doc. 1, p. 17) (emphasis added)  This appears to be a typographical error.  The sentence probably should have said "these money orders appear to be from *your* fraudulent account."  But regardless, this error did not adversely affect Moralez in any way.  The identity of the fraudulent account was not an issue.  The issue was, "Did Moralez have a real account anywhere?"  He did not.  This typographical error did not violate due process.

IT IS ORDERED that the Petition for Writ of Habeas Corpus pursuant to Title 28, United States Code, Section 2241, filed on June 5, 2013 by Gilberto Garcia Moralez is DENIED. (Doc. 1)

IT IS FURTHER ORDERED that the motion to dismiss filed by the respondent on October 21, 2013 is GRANTED.  (Doc. 12)

The Clerk is directed to prepare a judgment and close this case.

DATED this 11th day of April, 2014.

_Leslie A. Bowman_
Leslie A. Bowman
United States Magistrate Judge